UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 10-71359

DAVID J. KWIATKOWSKI,                               Chapter 13

        Debtor.                                 Judge Thomas J. Tucker

_____/

**OPINION REGARDING CREDITOR SUMMIT GROUP HOLDINGS, LLC'S
OBJECTIONS TO CONFIRMATION**

## I. Introduction

This case came before the Court for two hearings on confirmation of the Debtor's proposed Chapter 13 plan (Docket # 12, the "Plan"). The Court then held an evidentiary hearing regarding the objection to confirmation of the unsecured creditor Summit Group Holdings, LLC ("Summit Group"), that the Debtor's Plan is not proposed in good faith as required by 11 U.S.C. § 1325(a)(3).

The Court has considered all of the testimony and exhibits admitted into evidence at the evidentiary hearing, as well as the arguments of counsel. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated in this opinion, the Court finds and concludes that the Debtor's Plan is not proposed in good faith, as required by 11 U.S.C. § 1325(a)(3). But more fundamentally, the Court also concludes that the Debtor is not eligible to be a debtor in Chapter 13, under 11 U.S.C. § 109(e), and that the Debtor acted in bad faith in filing this case under Chapter 13, rather than under either Chapter 7 or Chapter 11. As a result, the Court will enter an order denying confirmation of Debtor's Chapter 13 Plan. And the Court will require the Debtor

to choose one of the following two options: that this case be converted to Chapter 7; or that this case be dismissed, with a one-year bar to refiling. The Court will not allow Debtor the option of now converting to Chapter 11.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," including Bankruptcy Code §§ 109(e) and 1325(a)(3). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases."

## III. Background

The Debtor, David J. Kwiatkowski, filed his voluntary Chapter 13 bankruptcy petition in this case on October 12, 2010. He filed his schedules and Statement of Financial Affairs on October 19, 2010,[1] and he also filed his proposed Chapter 13 Plan that day.[2] Debtor filed an

---

[1] Docket # 10 (a copy of which also is Creditor's Exhibit 1, admitted into evidence at the evidentiary hearing). Exhibits from the evidentiary hearing will be cited in this opinion as DX-_ for Debtor's exhibits, and as CX-__ for the creditor Summit Group's exhibits.

[2] Docket # 12; CX-4.

2

amended Schedule F on January 17, 2011.³

The Chapter 13 Trustee and Summit Group each filed objections to confirmation of Debtor's Plan.⁴ Summit Group objected on the ground that Debtor's Plan was not proposed in good faith. The Court held two non-evidentiary hearings on confirmation, on June 23, 2011 and July 28, 2011. At the first hearing, the Court heard oral argument, then allowed Summit Group and the Debtor to file briefs regarding Summit Group's objection.⁵ At the second hearing, the Court scheduled an evidentiary hearing on Summit Group's objection. The evidentiary hearing occurred on November 14 and 22, 2011.

In its objection to confirmation, and later in its oral arguments and brief, and then in the evidentiary hearing, Summit Group made numerous arguments and allegations against Debtor, to try to demonstrate that the Debtor had not proposed his Plan in good faith. Summit Group's bad-faith-related allegations included allegations that the Debtor had failed, in several specific ways, to fully and honestly disclose his assets, income, and other information about his financial affairs.

In addition, at the evidentiary hearing, Summit Group presented evidence and argument relating to Debtor's eligibility to be a Chapter 13 debtor, under 11 U.S.C. § 109(e). Summit Group argued that the Debtor is not eligible for Chapter 13 because his unsecured debts as of the petition date exceeded the $360,475 maximum in § 109(e).⁶ Summit Group also argued that the Debtor was guilty of bad faith because, among other reasons, the Debtor knew or had reason to

---

³ Docket # 32.

⁴ Docket ## 23, 25.

⁵ *See* Order, filed June 23, 2011 (Docket # 65).

⁶ *See* 11 U.S.C. § 109(e), quoted and discussed in Part IV-A-1 of this opinion.

know that his total unsecured debt exceeded the statutory maximum when he filed his petition, schedules, and Plan. But, according to Summit Group, Debtor improperly concealed the total amount of his unsecured debt in the schedules that he filed, including his original Schedule F.

The Chapter 13 Trustee's written objections to confirmation also raised the issue of Debtor's eligibility to be a Chapter 13 debtor. The Trustee objected to confirmation on the following ground, among others:

> The Trustee is unable to determine whether the debtor meets the eligibility requirements for Chapter 13 Relief pursuant to 11 U.S.C. [§] 109(e) based upon the debtor's Schedule F, which contains certain claims that fail to specify the amount of obligations owed by the debtor. The Trustee requests that the debtor amend Schedule F accordingly.[7]

## IV. Discussion

### A. Debtor's ineligibility to be a Chapter 13 debtor under 11 U.S.C. § 109(e)

#### 1. Section 109(e)

Bankruptcy Code § 109(e) limits who is eligible to be a debtor in Chapter 13, as follows:

> **Only an individual** with regular income **that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $360,475** and noncontingent, liquidated, secured debts of less than $1,081,400 or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $360,475 and noncontingent, liquidated, secured debts of less than $1,081,400 **may be a debtor under chapter 13 of this title**.

11 U.S.C. § 109(e)(emphasis added). The § 109(e) issue in this case is whether the Debtor owed, on the date of his bankruptcy petition, "noncontingent, liquidated, unsecured debts" totaling

---

[7] Docket # 23 at ¶ 1.

4

10-71359-tjt   Doc 138   Filed 01/25/13   Entered 01/25/13 15:50:46   Page 4 of 20

$360,475 or more. If he did, then he is ineligible to be a Chapter 13 debtor.

**2. Whether the Court should consider the eligibility issue at this point**

This issue has come before the Court in a somewhat roundabout way. This issue was first raised by the Chapter 13 Trustee's written objections to confirmation, quoted above. It is not entirely clear, but it appears that the Chapter 13 Trustee has abandoned this objection. In the two non-evidentiary hearings on confirmation that preceded the evidentiary hearing, the Trustee did not argue that the Debtor is ineligible under § 109(e), and when recounting the Trustee's unresolved objections to confirmation, Trustee's counsel did not mention the § 109(e) issue. And the Trustee did not participate in the evidentiary hearing.

Summit Group, by contrast, did not raise any § 109(e) eligibility objection in its initial written objections to confirmation, and did not expressly argue such an objection during the two non-evidentiary hearings on confirmation. Rather, Summit Group focused on its objection that the Debtor's Plan is not proposed in good faith. That objection, however, was based on Summit Group's allegations that the Debtor has not given a full and honest disclosure of his financial affairs, in numerous respects. During the evidentiary hearing, and in partial support of its "good faith" objection to confirmation, Summit Group presented argument and evidence that, among other things, (1) on the petition date, the Debtor in fact had noncontingent, liquidated, unsecured debts totaling substantially more than $360,475; and (2) Debtor knew or had reason to know this, but failed to properly disclose it in his Schedule F. And Summit Group argued that the Debtor in fact is not eligible to be a Chapter 13 debtor.

At the evidentiary hearing, the Debtor did not argue either (1) that Summit Group had waived the eligibility argument by not making it sooner; or (2) that the eligibility argument was

5

not relevant to Summit Group's "good faith" objection to confirmation. Rather, Debtor argued only the merits of Summit Group's arguments — *i.e.*, Debtor argued that he is eligible for Chapter 13, and that he did properly disclose his unsecured debts in his Schedule F.

Under the circumstances, the Court will not ignore the evidence that the Debtor is ineligible for Chapter 13, which is discussed below. In this case, such evidence is relevant to, and part of, Summit Group's *timely* objection to confirmation, that the Debtor's Plan is not proposed in good faith. And the Debtor's eligibility to be a Chapter 13 debtor is an issue of fundamental importance. For these reasons, the Court finds good cause to consider the eligibility issue, even though Summit Group did not raise the issue until the evidentiary hearing.[8] And having considered this issue, the Court concludes that Debtor is not eligible to be a Chapter 13 debtor.

### 3. Caselaw regarding the § 109(e) debt limitations

In determining whether a Chapter 13 debtor's debts exceeds the § 109(e) debt limitations, the focus is on the amount of the secured and unsecured debts as of the petition date. With respect to the nature and amount of the Debtor's secured and unsecured debts, the Court must look first to the Debtor's schedules. As the United States Court of Appeals for the Sixth Circuit has held, "Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." *Comprehensive Accounting Corp. v. Pearson* (*In re Pearson*), 773 F.2d 751, 757 (6th Cir. 1985); *see also Scovis v.*

---

[8] Even if Summit Group's § 109(e) argument is viewed as an *untimely* objection to confirmation of the Debtor's Plan, the Court's local rules permit the Court to consider an untimely objection to confirmation of a Chapter 13 plan, for "cause." *See* L.B.R. 3015-3(b)(2)(E.D. Mich.). Such "cause" exists here.

*Henrichsen* (*In re Scovis*), 249 F.3d 975, 982 (9th Cir. 2001)(same).

The § 109(e) debt limits apply only to debts that are "liquidated" and "noncontingent" as of the petition date. In *In re Redburn*, 193 B.R. 249, 259 (Bankr. W.D. Mich. 1996), the court discussed the meaning of "noncontingent" under 11 U.S.C. § 109(e):

> Neither the Bankruptcy Code, nor the legislative history provide a definition for the term "contingent" or the negative form "noncontingent" which appears in § 109(e). However, it is well-settled that "a debt is noncontingent if all events giving rise to liability occurred prior to the filing of the bankruptcy petition." Conversely, a contingent debt is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which *will trigger the liability of the debtor to the alleged creditor*."

*Id.* (italics in original)(citations omitted); *see also In re Tabor*, 232 B.R. 85, 89 (Bankr. N.D. Ohio 1999)("[I]t is well settled that a debt is noncontingent if all events giving rise to liability occurred prior to the filing of the bankruptcy petition.")(internal quotation marks and citations omitted).

Noting that the term "liquidated" is not defined by the Bankruptcy Code, the Sixth Circuit has held that a debt is "liquidated" if it "'can be determined by mathematical computation.'" *See Pearson*, 773 F.2d at 754 (citations omitted). In the *Pearson* case, the Sixth Circuit observed that the "courts are in disagreement as to whether the debt is unliquidated when there is a substantial dispute regarding liability or amount." *Id.* After discussing the conflicting cases, the *Pearson* court did not take a position on this issue. *See id.* at 754-55. But if a debt is unliquidated on the date of the petition, it does not count toward the § 109(e) debt limits, even if events after the petition date convert the debt into a liquidated debt. *See id.* at 758. Rather, the bankruptcy court should "look realistically to the state of the debtors' affairs as it reasonably

7

appeared on the date of filing." *Id.*

### 4. Whether Debtor's total unsecured debt exceeds the § 109(e) limit

Under § 109(e) and *Pearson*, therefore, the Court must begin with the Debtor's schedules, to determine the amount of the Debtor's liquidated, noncontingent, unsecured debt in this case, as of the petition date. Debtor's unsecured debts were listed in his Schedules E and F, which Debtor filed on October 19, 2010, seven days after the petition date.[9] Schedule E listed four priority unsecured claims, all of them income tax claims, totaling $23,312.00. None of these claims were designated on Schedule E as being contingent, unliquidated, or disputed.[10] Schedule F listed 22 nonpriority unsecured claims, 20 of which were quantified, totaling $258,833.00. None of these claims were designated on Schedule F as being contingent, unliquidated, or disputed.

Thus, the total of the unsecured debts quantified on Debtor's Schedules E and F was $282,145.00, and none of this unsecured debt was designated by Debtor as being contingent, unliquidated, or disputed. While this sum is below the § 109(e) limit of $360,475.00, it does not include two claims that were listed but not quantified on Debtor's Schedule F. The creditor listed for each of those unquantified claims is BAC Home Loans Servicing, LP ("BAC Home Loans"). Each claim was described only as "Possible deficiency," and as having been incurred in 2005. The amount of each claim was not stated; instead Debtor stated only that the amount was "Unknown." Debtor did not designate either of these claims as being contingent, unliquidated, or

---

[9] CX-1; Docket # 10.

[10] The official forms used for Schedules E and F have three columns where the Debtor is to indicate whether each claim is "contingent," "unliquidated," or "disputed." Debtor did not indicate that any of the claims listed on his Schedules E and F were any of these things.

disputed.

The evidence presented at the evidentiary hearing, including the Debtor's testimony, established that these two unquantified claims in Debtor's Schedule F were actually a single unsecured claim, owing to the mortgage creditor who had foreclosed on the Debtor's home in 2009. The evidence shows that when he filed his bankruptcy petition, and when he filed his Schedule F seven days later, the Debtor knew, and had reason to know, what the amount of this unsecured deficiency claim was, and that the claim was not contingent or unliquidated, or disputed. Before he filed his bankruptcy petition and Schedule F, Debtor had the necessary information, and also had the knowledge and ability, to calculate the amount of this debt. And in fact, Debtor actually knew, at a minimum, that this unsecured debt as of the petition date totaled at least $250,000. Thus, Debtor knew, and had reason to know, that his noncontingent, liquidated, unsecured debts, as of the petition date, totaled at least $532,145. This, of course, greatly exceeded the $360,475 maximum in § 109(e).

The foregoing findings are supported by the following evidence:

The Debtor testified as follows. He owned a home located at 477 Thetford Lane, Bloomfield Hills, Michigan, which he bought in 2004. He originally obtained a mortgage loan for approximately $496,000, which was 80% of the $620,000 purchase price. He later refinanced his mortgage loan "a couple of times," and the mortgage loan balance "finally got up to probably $570,000" or $575,000.[11] While he was still making payments on the mortgage loan, he received monthly statements from the mortgage company, and these showed not only the monthly

---

[11] Testimony of David Kwiatkowski, Tr. (Docket # 120) at 89-90.

9

payment to be made, but also how much Debtor owed on the mortgage loan.[12] After defaulting on the mortgage loan, Debtor moved out of the Bloomfield Hills home and moved to Chicago, in May or June of 2008. About six months after that, or in early 2009, the home was sold in a mortgage foreclosure sale.[13]

In the evidentiary hearing, Debtor first testified that he did not know what the foreclosure sale price was. But after being confronted with his earlier deposition testimony, he admitted knowing that the sale price was about $300,000.[14] Then, after being shown his 2009 federal income tax return, Debtor recalled that the foreclosure sale price was actually $319,974, which is the sale price he listed on Schedule D of his 2009 federal income tax return.[15]

There is no doubt that the Debtor both knew and had reason to know what the foreclosure sale price was, before he filed his schedules in this bankruptcy case. As noted above, Debtor filed his schedules, including his Schedules E and F, seven days after filing his bankruptcy petition. Debtor testified that when he filed his bankruptcy case, he obtained a copy of the sheriff's deed from the foreclosure sale, and recalls that the sheriff's deed "may have had a number on it" for the foreclosure sale price.[16] In fact, the sheriff's deed did list the foreclosure

---

[12] *Id.* at 91.

[13] *Id.* at 89-90.

[14] *Id.* at 91. In deposition testimony that he gave on December 28, 2010, the transcript of which was admitted into evidence as CX-5, Debtor testified that the Bloomfield Hills home was foreclosed in early 2009, and that it sold for $300,000 at the foreclosure sale. CX-5 at 10, 37. And he testified that the "possible deficiency" debt to BAC Home Loans listed in his Schedule F is the deficiency from this foreclosure sale. *See id.* at 10.

[15] Kwiatkowski testimony, Tr. (Docket # 120) at 93, 94; CX-13, Debtor's 2009 Federal Income Tax Return, Schedule D, line 8 column D.

[16] Kwiatkowski testimony, Tr. (Docket # 120) at 91.

sale price. While the sheriff's deed was not offered by either side as an exhibit during the evidentiary hearing, a copy of it is in the record. It is attached to the proof of claim that was filed on February 8, 2011, by Dyck, O'Neal, Inc., Claim No. 11.[17] That sheriff's deed shows that the Debtor's home was sold at a sheriff's sale conducted on August 4, 2009, and that the property was sold to Mortgage Electronic Registration Systems, Inc., for $301,877.50. The sheriff's deed was recorded with the Oakland County Register of Deeds on August 6, 2009.[18]

This evidence shows that when he filed his Schedules E and F, Debtor knew that the foreclosure sale price was $301,877.50. And this number is roughly consistent with the deposition testimony that Debtor gave on December 28, 2010, a little more than two months after he filed this case and his schedules, that the home sold for $300,000.[19]

Additional evidence showing that Debtor knew what the foreclosure sale price was when he filed his bankruptcy schedules is the fact that Schedule D of Debtor's 2009 federal income tax return listed a sale amount of $319,974. This sale price number is a bit higher than the sale price shown on the sheriff's deed, and there is no explanation in the record for why this is so. But the existence of this sale price number in Debtor's 2009 federal income tax return shows either that (1) Debtor obtained and provided the sale price amount to his accountant, who prepared his 2009 tax return; or (2) Debtor's accountant obtained the sale price amount and Debtor became aware of it, at the latest, when he reviewed and signed his 2009 federal income tax return. And we know, from Debtor's counsel's certification in the record, that Debtor had a copy of this income

---

[17] Proof of Claim No. 11, filed February 8, 2011, pdf p. 6.

[18] *Id.*

[19] *See* discussion in footnote 14.

11

tax return; he provided a copy of his 2009 federal income tax return to the Chapter 13 Trustee no later than November 2, 2010,[20] which was only two weeks after Debtor filed his schedules on October 19, 2010.

The Court finds that Debtor knew, and had reason to know, before he filed his Schedules E and F on October 19, 2010, that the foreclosure sale price was $301,877.50. From this, and from Debtor also knowing that his mortgage loan debt was at least $570,000 as of the time of the foreclosure sale in 2009, Debtor and his attorney each could easily have calculated that the deficiency debt owing to the mortgagee was at least the following amount as of the petition date: $570,000 - $301,877.50 = $268,122.50. Or, even if we assume that Debtor may have believed, from the sale price listed in his 2009 federal income tax return, that the foreclosure sale price was $319,974.00, then Debtor and his attorney could easily have calculated that the deficiency debt owing to the mortgagee was at least the following amount as of the petition date: $570,000 - 319,974.00 = $250,026.00. Either way, this unsecured debt clearly put Debtor's unsecured debt total well over the § 109(e) maximum for Chapter 13, and Debtor knew this and had reason to know this, as of the petition date.

Under the circumstances, it clearly was improper for Debtor to have listed the amount of this debt simply as "Unknown" on his Schedule F that he filed seven days after the bankruptcy petition. Nor was it proper for Debtor to list the amount of this debt as totaling $2.00, as he did

---

[20] *See* Certificate of Compliance with 11 [U.S.C.] § 521, etc., filed November 2, 2010 (Docket # 15), in which Debtor's counsel certified that "Debtor provided the Trustee with a copy of the Federal Income Tax Return required under applicable law (or a transcript of the return) for the most recent tax year ending immediately before the commencement of the case."

12

in the amended Schedule F that he filed on January 17, 2011.[21] Rather, good faith and honesty required Debtor to list the amount of mortgage loan deficiency claim as at least $250,000 in his Schedule F. Under the *Pearson* case, discussed above, the Court must disregard the Debtor's statements about the amount of his debt to BAC Home Loans, in his original Schedule F and his amended Schedule F, for purposes of determining Debtor's eligibility to be a Chapter 13 debtor, because Debtor's statements in these schedules were not made in good faith.

The Court further finds and concludes that the Debtor's obvious motive in failing to honestly and in good faith state the amount of his mortgage loan debt in his Schedule F and amended Schedule F was to try to reorganize his finances in Chapter 13, rather than having to try to do so in Chapter 11. For a variety of reasons, and as the Sixth Circuit noted in *Pearson*, "[g]enerally, Chapter 13 is simpler, speedier, and less expensive than Chapter 11." 773 F.2d at 753.

It follows from the foregoing that Debtor's filing this bankruptcy case under Chapter 13, rather than under Chapter 7 or Chapter 11, and in proposing his Chapter 13 Plan, were not done in good faith.

**5. Debtor's arguments**

At the evidentiary hearing, Debtor's counsel made two arguments about this mortgage loan deficiency debt. First, he argued that when Debtor filed his petition and schedules, Debtor was not sure if he owed *any* debt on his mortgage loan after the sheriff's sale, because (1) Debtor

---

[21] Docket # 32. In his amended Schedule F, Debtor still listed the "Possible deficiency" debt to BAC Home Loans twice, and each time listed the amount as "$1.00." In his amended Schedule F, Debtor continued to not list this debt as being contingent, unliquidated, or disputed. Debtor's amended Schedule F did not make any other changes; it still listed the other unsecured debts totaling $258,833.00, none of which was listed as contingent, unliquidated, or disputed.

13

testified that he was not sure how a sheriff's sale works;[22] and (2) Debtor had not heard anything from the mortgage creditor about the debt since the foreclosure sale occurred.

The first point is supported only by Debtor's testimony, but the Court finds that Debtor's testimony on this point is not credible. First, when cross-examined during the evidentiary hearing about his ability to have calculated the amount of the deficiency owing on his mortgage loan, Debtor admitted that he "assumed that he owed them some money."[23] Second, the Court does not believe that Debtor was unaware that he continued to owe a substantial deficiency amount after the sheriff's sale. This Debtor is not unsophisticated when it comes to mortgage loans. Debtor has a degree in business finance from the University of Michigan, and in fact, Debtor previously owned and operated a mortgage company for several years, and was a mortgage broker.[24] (Debtor's debt to Summit Group is based on Debtor's personal guarantee of a lease between Debtor's former mortgage company and Summit Group.) And it is well established and fundamental under Michigan law that when a mortgage foreclosure sale occurs, the mortgage loan debt is reduced only by the amount of the foreclosure sale price. The loan balance is not eliminated altogether, unless the foreclosure sale price equals or exceeds the total debt amount. With one exception not applicable here,[25] if the foreclosure sale price is less than

---

[22] *See* Kwiatkowski testimony, Tr. (Docket # 120) at 97-99.

[23] *Id.* at 93, lines 23-24.

[24] *Id.* at 35, 56-57.

[25] The exception is that where the mortgagee is the purchaser at a foreclosure-by-advertisement sale, the mortgagee's right to a deficiency judgment can be defeated or reduced if and to the extent the debtor "allege[s] and show[s]" "that the property sold was fairly worth the amount of the debt secured by it at the time and place of sale or that the amount bid was substantially less than its true value[.]" *See* Mich. Comp. Laws Ann. § 600.3280. This is an affirmative defense, which the debtor must plead and prove. *See Harmonie Club Enters., LLC v. TCF Nat'l Bank*, No. 264046, 2007 WL 1553597, at *6

the unpaid principal and interest on the mortgage plus the costs of foreclosure, the mortgagee has an unsecured deficiency claim against the debtor for the difference. *See, e.g., Pulleyblank v. Cape*, 446 N.W.2d 345, 347 (Mich. Ct. App. 1989)("There is no question that Pulleyblank, as mortgagee, had a right to purchase the property, and collect for a deficiency, if one existed. [Mich. Comp. Laws] § 600.3280; M.S.A. § 27A.3280; *First of America Bank-Oakland Macomb, NA v. Brown*, 158 Mich.App. 76, 81, 404 N.W.2d 706 (1987)."); *NPB Mortg., L.L.C. v. Golliday*, Nos. 301830, 301831, 2012 WL 516763, at *2 (Mich. Ct. App. Feb. 16, 2012). This has long been the law in Michigan. *See New York Life Ins. Co. v. Erb*, 268 N.W. 754, 755 (Mich. 1936).

But even if Debtor really was unsure about whether he continued to owe a debt for the deficiency after the foreclosure sale, good faith required Debtor to ask his bankruptcy counsel about this; and he then could have and would have learned that he *did* continue to owe such a debt. Debtor did not testify that he ever asked his attorney about this point, or that his attorney ever told him that the sheriff's sale eliminated all debt on the mortgage loan, even though (as Debtor knew,) the foreclosure sale price was at least $250,000 less than the total mortgage loan debt.

The mere fact that the mortgage loan creditor did not take any steps to try to collect its deficiency from the Debtor after the foreclosure sale, if true, does not mean that the debt did not exist. This is not a valid excuse for Debtor's failure to list the deficiency balance owing on the

---

(Mich. Ct. App. May 24, 2007)(per curiam); *see also NPB Mortg., L.L.C. v. Golliday*, Nos. 301830, 301831, 2012 WL 516763, at *1, 2 (Mich. Ct. App. Feb. 16, 2012). In this case, the Debtor has never alleged or argued, or presented any evidence, that the foreclosure sale price was substantially less than the value of the property, *or* that Debtor ever thought so. If anything, Debtor has admitted otherwise. As noted earlier in this opinion, the Debtor stated in his Schedule F that the "[p]ossible deficiency" that he owed to the mortgage creditor BAC Home Loans, the amount of which allegedly was "unknown" to Debtor, was not contingent, not unliquidated, *and* not disputed.

15

mortgage loan in his Schedule F.

The second line of argument by Debtor's counsel concerning the mortgage loan debt relates to the proof of claim that was filed in this case on such debt. As noted earlier, a proof of claim based on the mortgage loan debt was filed on February 8, 2011, by Dyck, O'Neal, Inc., of Arlington, Texas, Claim No. 11. Dyck, O'Neal apparently was an assignee of the mortgage loan debt, and alleged in its claim that it was owed an unsecured debt of $472,164.43.[26] Debtor filed an objection to this claim, on April 8, 2011.[27] The only basis for objection to the claim asserted by Debtor was that the "property securing said mortgage note has been foreclosed pursuant to the power of sale contained therein and a Sheriff's Deed, dated August 6, 2009, has been entered with the Oakland County Register of Deeds."[28] Based on this, Debtor's claim objection requested that the claim be disallowed. Because the claimant did not file a timely response to this claim objection, it was sustained, and Dyck, O'Neal's claim was disallowed, in an order filed May 17, 2011.[29]

The fact that this claim was disallowed, by default, based on the Debtor's stated ground of objection, does not mean that Debtor did not owe an unsecured deficiency claim on the mortgage loan of at least $250,000 as of the petition date. At most, it means that the Dyck, O'Neal claim was disallowed, and therefore will not be entitled to any distribution in this bankruptcy case, not because no debt was owing as of the petition date, but rather *because the*

---

[26] Proof of Claim No. 11, filed February 8, 2011.

[27] Docket # 51.

[28] *Id*.

[29] Docket # 56.

16

10-71359-tjt    Doc 138    Filed 01/25/13    Entered 01/25/13 15:50:46    Page 16 of 20

*claim as filed failed to credit (reduce) the debt amount by the proceeds of the foreclosure sale (i.e., by the amount of the foreclosure sale price.)* And in any event, this claim disallowance, which occurred some seven months after the bankruptcy petition was filed, does not mean that no debt was owed as of the petition date. Consistent with the Sixth Circuit's requirement in the *Pearson* case, quoted above, the Court must "look realistically to the state of the debtor['s] affairs as it reasonably appeared on the date of filing."

Doing this, the Court must conclude that Debtor's liquidated, noncontingent, unsecured debts as of the petition date clearly far exceeded the § 109(e) maximum. As a result, Debtor is not eligible to be in Chapter 13.

**B. What the Court should do in light of Debtor's ineligibilty for Chapter 13**

The Court cannot confirm Debtor's Chapter 13 Plan, and this case cannot continue under Chapter 13. The case can now take one of only three possible routes — conversion to Chapter 11 under 11 U.S.C. § 1307(d); conversion to Chapter 7 under 11 U.S.C. § 1307(a) or § 1307(c); or dismissal under 11 U.S.C. § 1307(b) or § 1307(c). Summit Group asks the Court to convert this case to Chapter 7. It is unclear what option Debtor will want to take, now that Chapter 13 is not available.

Normally, having found Debtor ineligible for Chapter 13, the Court would allow Debtor to choose which alternative route to take. But in this case, the Court has found that Debtor did not act in good faith in the way he listed his mortgage loan debt in his Schedule F and amended Schedule F, and did not act in good faith in filing this case under Chapter 13. And Summit Group has alleged that Debtor has acted in bad faith and has been dishonest in several additional ways, all of which justifies conversion of this case to Chapter 7, according to Summit Group.

17

In other cases, this Court has sanctioned debtors for bad faith and for being dishonest with the Court. For example, in *In re Mehlhose*, 469 B.R. 694, 706-13 (Bankr. E.D. Mich. 2012), this Court dismissed a Chapter 13 case, barred the debtors from filing any new bankruptcy case for two years, and required the debtors to pay the attorney fees and expenses of the opposing creditor's counsel, after finding that the debtors had filed their bankruptcy case in bad faith, and had lied about their incomes in their Schedule I. In *Mehlhose*, the Court discussed at length the Court's legal authority to sanction debtors for bad faith and dishonesty to the Court, and the Court incorporates that discussion by reference.

Apart from the issue of the Debtor's good faith and honesty related to his eligibility for Chapter 13, discussed in this opinion above, and after carefully considering the evidence, the Court finds and concludes that none of Summit Group's various other allegations of bad faith and dishonesty by the Debtor have been proven. The evidence presented at the evidentiary hearing fails to support these allegations.

What remains is the Debtor's bad faith in the way he failed to properly disclose the amount of the mortgage loan deficiency debt in his Schedule F and amended Schedule F, and relatedly, his filing this case under Chapter 13 in bad faith. Because the Debtor's bad faith and improper conduct here was undertaken for the purpose of trying to reorganize his finances in Chapter 13, rather than having to try to do so in Chapter 11, the Court finds that the appropriate remedy now is to deny the Debtor any opportunity to reorganize in Chapter 11. If Debtor wanted to pursue a reorganization of his finances, rather than a Chapter 7 liquidation, Debtor should have filed a Chapter 11 case to begin with. Instead, Debtor filed under Chapter 13, and pursued confirmation of a Chapter 13 plan, when all the while Debtor knew or should have known that he

was not eligible for Chapter 13 relief, under 11 U.S.C. § 109(e). In the exercise of its discretion to fashion appropriate relief for Debtor's bad faith, the Court will now deny Debtor any belated opportunity to reorganize under Chapter 11. To do otherwise would be to allow an abuse of the bankruptcy system, and the Court has authority to prevent such abuse. *See, e.g.,* 11 U.S.C. § 105(a)(under which the bankruptcy court has authority to take any action necessary or appropriate to prevent an abuse of process); *see also In re Mehlhose*, 469 B.R. at 708-12 and authorities cited therein.

The Court will limit its sanctions for Debtor's bad faith to the foregoing. Under the circumstances, to go further with sanctions would be too harsh. Thus, the Court will not deny Debtor the opportunity to convert this case to Chapter 7, if that is what Debtor decides he now wants to do. Nor will the Court deny the Debtor the opportunity to dismiss this bankruptcy case, if that is Debtor's choice. But if Debtor chooses to dismiss this case, rather than convert it to Chapter 7, the Court will enter an order barring Debtor from filing any new bankruptcy case for one year after the dismissal of this case. This bar to refiling, if Debtor chooses dismissal, is necessary to prevent an abuse of process. If Debtor could simply dismiss this case, then turn around and file a new bankruptcy case right away or in the near future, such a refiling would be an abuse, because it either would be an improper attempt to evade this Court's rulings today (if Debtor refiled under either Chapter 13 or 11); or would serve no legitimate purpose (if Debtor refiled under Chapter 7, having just spurned the opportunity to convert this case to Chapter 7).

**V. Conclusion**

Based on the findings of fact, conclusions of law, and the reasons stated in this opinion, the Court will enter an order sustaining Summit Group's objection to confirmation of the

19

Debtor's Plan and denying confirmation of that Plan.  Because this case cannot remain pending as a Chapter 13 case, and for the reasons stated in this opinion, the Court's Order also will set a 14-day deadline for the Debtor to choose one of the following two options: that this case be converted to Chapter 7; or that this case be dismissed, with a one-year bar to refiling.  If Debtor takes no timely action to choose one of these options, the Court will enter an order converting this case to Chapter 7.

**Signed on January 25, 2013**                              /s/ Thomas J. Tucker        
                                                                   **Thomas J. Tucker**
                                                                   **United States Bankruptcy Judge**

10-71359-tjt    Doc 138    Filed 01/25/13    Entered 01/25/13 15:50:46    Page 20 of 20